1   WO

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9   Penny A. Petty,                          No. CV-12-02289-PHX-BSB

10                    Plaintiff,             **ORDER**

11  v.

12  Carolyn W. Colvin, Acting Commissioner
    of Social Security,

13

14                    Defendant.

15

16          Penny A. Petty (Plaintiff) seeks judicial review of the final decision of the

    Commissioner of Social Security (the Commissioner) denying her application for
17
    disability insurance benefits under the Social Security Act (the Act).  The parties have
18
    consented to proceed before a United States Magistrate Judge pursuant to 28
19
    U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure
20
    16.1.[1]  For the following reasons, the Court affirms the Commissioner's decision.
21
    **I.     Procedural Background**
22
            In October 2008, Plaintiff applied for disability insurance benefits under Title II of
23
    the Act.  42 U.S.C. § 401-34.  (Tr. 109-11.)[2]  Plaintiff alleged that she had been disabled
24
    since October 1, 2004.  (*Id.*)  Based on Plaintiff's employment history, her date last
25

26  ───────────────

27          [1]  The Court finds this matter suitable for resolution on the briefing and, therefore,
    denies Plaintiff's request for oral argument.

28          [2]   Citations to "Tr." are to the certified administrative transcript of record.
    (Doc. 14.)

1    insured was in December 2009.  (Tr. 113.)  After the Social Security Administration

2    (SSA) denied Plaintiff's initial application and her request for reconsideration, she

3    requested a hearing before an administrative law judge (ALJ).  After conducting a

4    hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act.  (Tr. 14-

5    24.)  This decision became the final decision of the Commissioner when the Social

6    Security Administration Appeals Council denied Plaintiff's request for review.  (Tr. 1-6);

7    *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council.)

8    Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

9    **II.    Medical Record**

10        The record before the Court establishes the following history of diagnosis and

11    treatment related to Plaintiff's health.  The record also includes opinions from State

12    Agency Physicians who either examined Plaintiff or reviewed the records related to her

13    health, but who did not provide treatment.

14        **A.    Mahesh S. Mokhashi, M.D.**

15        In October 2004, Plaintiff sought treatment from digestive health specialist,

16    Mahesh S. Mokhashi, M.D., complaining of Barrett's esophagus, acid reflux, and post-

17    traumatic stress disorder.  (Tr. 280.)  On October 13, 2004, Dr. Mokhashi noted that he

18    treated Plaintiff for Barrett's esophagus, gastroesophageal reflux disease (GERD),

19    obesity, and irritable bowel syndrome (IBS), among other issues.  (Tr. 224.)  He noted

20    that Plaintiff was doing well on Nexium and that she denied any acid reflux symptoms.

21    (*Id.*)  He also found that Plaintiff was "doing really well" with her IBS and her symptoms

22    were largely under control.  (*Id.*)  The next month, on November 24, 2004, Dr. Mokhashi

23    noted that "[f]or the past few days" Plaintiff's IBS had flared up and she was "having

24    some nausea and diarrhea."  (Tr. 222.)  He gave her samples of Robinul and asked

25    Plaintiff to call and let him know how she responded to the medication.  (*Id.*)

26        Plaintiff returned to Dr. Mokhashi two years later, in November 2006.  (Tr. 220.)

27    He noted that Plaintiff was under a lot of stress due to family issues, but was "doing very

28    well."  (*Id.*)  Her acid reflux symptoms were "much controlled" with Nexium.  (Tr. 220.)

1   The following year, in July 2007, Dr. Mokhashi noted that recent diagnostic tests
2   revealed a hiatal hernia and a mass suggestive of Barrett's esophagus.  (Tr. 219.)
3   Although Plaintiff had "proven Barrett's twice in the past," testing was negative for
4   Barrett's esophagus.  (Tr. 219, 226.)  He again noted that Plaintiff's reflux symptoms
5   were well controlled with Nexium and recommended that she take it on a long-term
6   basis.  (*Id.*)

7       Plaintiff returned Dr. Mokhashi more than a year later, on October 17, 2008.
8   (Tr. 218.)  She reported that she was under "tremendous distress at home" because she
9   was separated from her husband, she was having financial difficulties, her son was in
10  prison, and she was raising her grandchildren.  (*Id.*)  She complained of increasing
11  nausea, abdominal pain, and diarrhea and cramping after meals.  (*Id.*)  Dr. Mokhashi
12  "suspect[ed] she [was] noticing a flare of her [IBS] due to her severe stress."  (*Id.*)  He
13  offered Plaintiff anticholinergics, but because "she would rather not take medications,"
14  Dr. Mokhashi asked her to take Benefiber nightly and to follow up with him in four
15  weeks.  (*Id.*)  He also ordered an abdominal ultrasound, which revealed a small polyp or
16  stone in her gallbladder.  (Tr. 218, 214.)

17      Plaintiff next saw Dr. Mokhashi a month later, on November 14, 2008.  (Tr. 261.)
18  She reported a burning sensation in her upper abdomen.  (*Id.*)  Dr. Mokhashi noted that
19  medication prescribed by Dr. Jeffrey Morgan, M.D., her primary care doctor, had helped
20  Plaintiff's nausea.  He also noted that Plaintiff should continue taking Benefiber and
21  return in a few months.  (*Id.*)  In January 2009, Dr. Mokhashi noted that Plaintiff
22  continued to be under "severe stress at home," but was feeling somewhat better since
23  Dr. Morgan had prescribed an anti-depressant.  (Tr. 260.)  Plaintiff also reported
24  epigastric discomfort caused by asthma-related coughing.  (*Id.*)  Dr. Mokhashi suspected
25  her epigastric discomfort was musculoskeletal because all diagnostic tests were negative.
26  (*Id.*)

27      Plaintiff followed up with Dr. Mokhashi on April 14, 2009.  (Tr. 366.)  She
28  continued to complain of epigastric and abdominal pain.  (*Id.*)  She also reported nausea,

1   vomiting, and diarrhea "due to her diarrhea predominant [IBS]." (*Id.*)  Dr. Mokhashi

2   opined that Plaintiff's symptoms were "most likely" due to extreme stress and anxiety.

3   (Tr. 366.)  He prescribed Phenergan for nausea and vomiting and noted that Plaintiff's

4   reflux symptoms were "reasonably well controlled on Nexium." (*Id.*)  Dr. Mokhashi

5   ordered a follow-up endoscopy that revealed a small hernia, but showed that Plaintiff did

6   not have Barrett's esophagus.  (Tr. 366, 369.)

7       **B.    Jeffrey W. Morgan, D.O.**

8       On May 15, 2008, Plaintiff began treatment at the office of primary care physician

9   Jeffrey W. Morgan, D.O., complaining of congestion.  (Tr. 246-47.)  Physician Assistant

10  Rebecca Reedy noted Plaintiff's history of GERD and IBS.  Plaintiff reported a history of

11  "spastic colon that she controls with her diet." (Tr. 246.)  Plaintiff reported being under

12  stress due to family issues.  (*Id.*)  The physician assistant recommended that Plaintiff stop

13  smoking and take Symbicort for her asthma.  (Tr. 247.)

14      A June 16, 2008 treatment note states that Plaintiff experienced low back pain,

15  nausea and vomiting, and a history of a "spastic colon." [3]  (Tr. 244.)  Plaintiff reported

16  that she had eaten shrimp for dinner that had tasted "funny." (*Id.*)  The treatment note

17  also indicates that Plaintiff's asthma was better with Symbicort.  (*Id.*)  On October 27,

18  2008, Plaintiff saw physician assistant Reedy and Dr. Morgan complaining of numbness

19  and tingling on the left side of her face and in both arms.  (Tr. 242.)  Diagnostic tests

20  were negative.  (Tr. 242-43, 249.)  Plaintiff also complained of persistent nausea due to

21  her IBS, but denied vomiting.  (Tr. 242.)  A November 7, 2008 treatment noted indicates

22  that Plaintiff had constant dull and achy abdominal pain and burning in her chest.

23  (Tr. 241.)   The treatment note states that medication, Zofran, was helping Plaintiff's

24  nausea.  (*Id.*)

25

26

27      [3] The treatment notes from Dr. Morgan's office, Desert Harbor Internal Medicine,
    are difficult to read and it is often difficult to determine whether Dr. Morgan, Physician
28  Assistant Rebecca Reedy, or some other provider signed the treatment notes.  However,
    many of the treatment notes are stamped "reviewed by Jeffrey Morgan D.O."  When
    possible, the Court identifies the provider who signed the treatment notes.

A January 9, 2009 treatment note indicates that Plaintiff had experienced problems with her asthma for the last few days.  (Tr. 356.)  It also notes that Plaintiff had "soft stools" and that her nausea had not improved.  (*Id.*)  A January 30, 2009 treatment note indicates that Plaintiff's moods were better on Lexapro, and that Symbicort had helped her asthma.  (Tr. 355.)  Plaintiff reported that she had experienced two "episodes of diarrhea severe since her last visit" and had "diarrhea in her underwear." (*Id.*)  In March 2009, Plaintiff reported diffuse wheezing, nasal congestion, and aching all over. (Tr. 354.)

An April 8, 2009 treatment note indicates that Plaintiff had diffuse abdominal pain and nausea.  (Tr. 397.)  She reported "bloody black stools worse [with] eating fatty foods." (*Id.*)  On April 23, 2009, Plaintiff reported that her stomach was doing better and that her pain was improved "taking Nexium."  (Tr. 396.)  She reported no "bloody/black stools."  (*Id.*)  A few months later, on July 24, 2009, Plaintiff reported that her "GI problems (vomiting and diarrhea) had worsened over the last few weeks."  (Tr. 395.) Plaintiff reported that she "was now keeping [a] log of symptoms for SS disability.  Has diarrhea 7-17 times /d[ay]."  (*Id.*)  Plaintiff reported that Lexapro was not helping her mood as much, and her dosage of Lexapro was increased.  Plaintiff complained of coughing "a lot" and was again advised to quit smoking.  (*Id.*)

On September 10, 2009, Dr. Morgan saw Plaintiff to complete a medical assessment of Plaintiff's ability to do work-related physical activities for her claim for social security disability benefits.  (Tr. 394, 378-79.)  Dr. Morgan opined that, during an eight-hour day, Plaintiff could sit for up to two hours or less, stand/walk for up to two hours or less, and lift and carry less than ten pounds.  He also opined that she could continuously use her hands and feet, reach, balance, and occasionally bend, but that she could never crawl, climb, stoop, crouch, kneel, be exposed to unprotected heights, marked changes in temperature, or dust, fumes, and gases.  (Tr. 378-79.)  He noted that Plaintiff's complaints of IBS with "frequent/ up to 20 bowel movements," "loose watery stools, extreme nausea, fatigue, [illegible]" affected Plaintiff's ability to function.

(Tr. 378.)  Finally, he noted that "most of the gastrointestinal related [illegible] meds resulted in mod[erate] severe S/E [side effects] of headaches, dizziness, [and] worsening [illegible]."  (Tr. 379.)

A February 18, 2010 treatment note, signed by Physician Assistant Reedy and Dr. Morgan, indicates that Plaintiff complained of pain at a level ten out of ten related to passing kidney stones.  (Tr. 392.)  Plaintiff was advised to go to the emergency room due to her pain, but she declined stating that she did not want to wait there.  (Tr. 392-93.) Plaintiff also reported nausea and that she had vomited four to five times a day for the past six days.  (Tr. 392.)

In March 2010, Plaintiff saw Dr. Morgan "requesting assistance in completing a work-related activities form from Slepian Law Office . . . She states she is still unable to work." (Tr. 391.)  Dr. Morgan reported that Plaintiff's physical examination was normal. (*Id.*)  He also reported that Plaintiff's symptoms (chronic pain, chronic nausea, bruising, IBS, urinary incontinence, and urinary symptoms) were slightly worse.  (*Id.*)  Dr. Morgan completed a medical assessment of ability to do work-related physical activities assessing the same limitations as he had on the assessment form he completed in September 2009. (*Compare* Tr. 381-82 *with* Tr. 378-79.)  Unlike the 2009 form, the 2010 form did not include any notes regarding the frequency of Plaintiff's diarrhea or other symptoms. (Tr. 381-82.)

**C.    Quirino Valeros, M.D.**

On December 30, 2008, Quirino Valeros, M.D. examined Plaintiff in connection with her application for disability benefits.  (Tr. 296.)  Plaintiff reported that she did not take any medication for diarrhea or cramping pain associated with her IBS.  (Tr. 296.) Dr. Valeros reported that Plaintiff's physical examination was normal.  (Tr. 297.)  He opined that she could occasionally lift thirty to forty pounds, frequently lift ten pounds, had no limitations regarding sitting, seeing, hearing, or speaking, and could frequently climb ramps/stairs, stoop, kneel, crouch, crawl, reach, handle, finger, and feel.  (Tr. 362-64.)

### D.      Sharon Steingard, D.O.

On January 8, 2009, Plaintiff had a psychiatric consultative examination with Sharon Steingard, D.O., in connection with her application for disability benefits. (Tr. 344.)  Plaintiff stated she did not believe she had depression, but she did have some life stressors. (Tr. 345.)  Dr. Steingard noted that the Plaintiff's self-reported history suggested she previously had PTSD and conversion disorder, both of which were in remission.  (Tr. 348.)  She opined that Plaintiff's understanding and memory were grossly intact, that she had no difficulty with sustained concentration and persistence, that she had no problem with social interaction, although she negatively responded to stress, and that she was capable of a variety of simple tasks and tasks requiring more than one or two steps.  (Tr. 349.)

### E.      Rosalia Pereyra, Psy.D., and Adrianne Gallucci, Psy.D.

On January 14, 2009, state agency psychologist, Rosalia Pereyra, Psy.D., opined that Plaintiff had no severe psychological impairments.  (Tr. 320-33.)  This opinion was later affirmed by reviewing state agency psychologist, Adrianne Gallucci, Psy.D. (Tr. 358-59.)

### F.      H. Horsley, M.D., and Robert Quinones, D.O.

On January 14, 2009, state agency physician H. Horsley, M.D., reviewed the medical record and completed a Physical Functional Capacity Assessment.  (Tr. 335.)  He determined that Plaintiff was capable of functioning at a level consistent with the demands of medium exertional work.  (Tr. 334-42.)  He suspected Plaintiff of symptom magnification.  (Tr. 340.)

On May 20, 2009, state agency physician Robert Quinones, D.O., reviewed the record, including treatment notes from Dr. Mokhashi and from Dr. Morgan's office. (Tr. 360-61.)  He concluded that the medical record supported Dr. Horsley's residual functional capacity (RFC) opinion and adopted that opinion.  (*Id.*)

### G.    Additional Medical Treatment

In October 2009, Plaintiff sought care from endocrinologist, C. Meera Menon, M.D., for significant weight gain over the previous year.  (Tr. 458-59.)  Plaintiff thought she had Cushing's disease, but Dr. Menon concluded that was very unlikely.  (Tr. 459.)  In follow-up, Dr. Menon again reassured Plaintiff that she did not have Cushing's disease, and informed her that her cortisol levels and thyroid function were normal.  (Tr. 457).

From January 2010 through January 2011, Plaintiff sought care from Josh Baldwin, D.C.  (Tr. 463-506.)  Dr. Baldwin noted that Plaintiff made steady progress.  (Tr. 463-506.)  In February 2011, he opined that Plaintiff had impairments that limited her ability to work.  (Tr. 533-34.)

In April and May 2010, Plaintiff obtained care from urologist, Paul Block, M.D., for incontinence associated with coughing, which she believed had worsened since she reportedly passed eight kidney stones in February 2010.  (Tr. 413.)  Her physical examinations and diagnostic tests were normal.  (Tr. 413-33.)

In April 2010, Plaintiff sought care from allergist Kevin M. Boesel, M.D.  He noted the results of an allergy skin test and asthma test and made recommendations to reduce allergies.  (Tr. 443-48.)  He advised Plaintiff to avoid penicillin and macrolides.  (Tr. 444.)   In April and June, Plaintiff followed up with Dr. Boesel and at these appointments her physical examinations were normal.  (Tr. 436-37, 440-41.)

In August and October 2010, Plaintiff sought care from urologist, Paul Marshburn, M.D.  (Tr. 451.)  He noted that Plaintiff had "symptoms of mixed urinary incontinence with urodynamic stress incontinence demonstrated."  (Tr. 449.)  He suggested Kegel exercises, pelvic floor physiotherapy, and a suburethral sling surgery to be scheduled later.  (*Id*.)  He noted that Plaintiff understood that "her component of frequency, urgency, and urge incontinence would not be addressed by any surgical treatment."  (*Id.*)  Plaintiff stated that she was most concerned with "stress incontinence and wanted to proceed with a suburethral sling."  (*Id*.)

### III.     Administrative Hearing Testimony

Plaintiff appeared with counsel at the administrative hearing.  Plaintiff was in her late forties in December 2009 when her insured status expired.  (Tr. 109, 113.)  She had a high school education and had attended but not completed college.  Her past relevant work included waitress, administrative assistance, collection worker, and teller.  (Tr. 23, 132-145.)

Plaintiff testified at the administrative hearing that she was unable to work due to IBS, acid reflux/GERD, fibromyalgia, anxiety, and depression.  (Tr. 36, 39.)  She testified that she experienced pain, fatigue, nausea, diarrhea, and vomiting.  (Tr. 39.)  She stated that she could have up to thirty bowel movements a day, and could be in the restroom for up to thirty minutes at a time.  (Tr. 40.)  Plaintiff further stated that she had urinary incontinence and used protective pads.  (Tr. 41.)  Plaintiff stated that she avoided leaving her home because she was afraid of having an accident in public.  (*Id.*)  She stated that she had to lie down during the day due to severe abdominal pain.  (Tr. 42.)  Vocational expert Sanrda Richter also testified at the administrative hearing in response to hypothetical questions from the ALJ and Plaintiff's counsel.  (Tr. 49-52.)

### IV.     The ALJ's Decision

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).  To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.     Five-Step Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and

(2) that her disability is severe.  20 C.F.R. § 404.1520(a) (c).  If a claimant meets steps one and two, she may be found disabled in two ways at steps three through five.  At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's RFC.  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.    ALJ's Application of Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period.  (Tr. 16.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "irritable bowel syndrome, gastroesophageal reflux disease (GERD), urge and stress incontinence, obesity, and asthma."  (Tr. 16.)  At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18.)  The ALJ next concluded that Plaintiff retained the RFC "to perform sedentary work as defined in 20 C.F.R.§ 404.1567(a) except the claimant is limited to unskilled work due to the effects of intermittent abdominal pain."  (Tr.  19.)  The ALJ concluded that Plaintiff could not perform her past relevant work.  (Tr. 23.)  At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, she could perform other "jobs that existed in significant numbers in the national economy."  (*Id*)  The ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (Tr. 24.)

1    **V.    Standard of Review**

2        The district court has the "power to enter, upon the pleadings and transcript of

3    record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

4    with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

5    court reviews the Commissioner's final decision under the substantial evidence standard

6    and must affirm the Commissioner's decision if it is supported by substantial evidence

7    and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

8    (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ

9    erred, however, "[a] decision of the ALJ will not be reversed for errors that are

10   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

11       Substantial evidence means more than a mere scintilla, but less than a

12   preponderance; it is "such relevant evidence as a reasonable mind might accept as

13   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

14   (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

15   determining whether substantial evidence supports a decision, the court considers the

16   record as a whole and "may not affirm simply by isolating a specific quantum of

17   supporting evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

18   quotation and citation omitted).

19       The ALJ is responsible for resolving conflicts in testimony, determining

20   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

21   Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

22   interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.*

23   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

24   **VI.    Plaintiff's Claims**

25       Plaintiff argues that the ALJ erred in discounting her subjective complaints,

26   weighing medical opinion evidence, weighing other source and lay witness opinions,

27   assessing her RFC, and by applying the Medical Vocational Guidelines to determine

28   whether Plaintiff was disabled.

1

### A.     The Two-Step Credibility Analysis

2          Plaintiff asserts that the ALJ erred in rejecting her subjective complaints.  An ALJ

3   engages in a two-step analysis to determine whether a claimant's testimony regarding

4   subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36

5   (9th Cir. 2007).   "First, the ALJ must determine whether the claimant has presented

6   objective medical evidence of an underlying impairment 'which could reasonably be

7   expected to produce the pain or other symptoms alleged.'"  *Id*. at 1036 (quoting *Bunnell*

8   *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

9          The claimant is not required to show objective medical evidence of the pain itself

10  or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at

11  1282.   Instead, the claimant must only show that an objectively verifiable impairment

12  "could reasonably be expected" to produce his pain.   *Lingenfelter*, 504 F.3d at 1036

13  (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec*., 533 F.3d

14  at 1160-61 (9th Cir. 2008) ("requiring that the medical impairment could reasonably be

15  expected to produce pain or another symptom . . . requires only that the causal

16  relationship be a reasonable inference, not a medically proven phenomenon").

17         Second, if a claimant produces medical evidence of an underlying impairment that

18  is reasonably expected to produce some degree of the symptoms alleged, and there is no

19  affirmative evidence of malingering, an ALJ must provide "clear and convincing"

20  reasons" for an adverse credibility determination.[4]  *See Smolen*, 80 F.3d at 1281; *Gregor*

21  *v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

22  _____

23         [4]  Relying on the Ninth Circuit decision in *Bunnell*, the Commissioner appears to
    argue that an ALJ need not provide "clear and convincing" reasons for discrediting a
24  claimant's testimony regarding subjective symptoms, and instead must make findings
    that are "'supported by the record' and 'sufficiently specific to allow a reviewing court to
25  conclude the adjudicator rejected the claimant's testimony on permissible grounds.'"
    (Doc. 26 at 15-16.)   In *Bunnell*, the court did not apply the "clear and convincing"
26  standard and that decision has not been overturned.  Although the Ninth Circuit has not
    overturned *Bunnell*, subsequent cases have elaborated on its holding and have accepted
27  the clear and convincing standard.  *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d
    1228, 1234 (9th Cir. 2011); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009);
28  *Lingenfelter*, 504 F.3d at 1036; *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).
    Accordingly, the Court will determine whether the ALJ provided clear and convincing
    reasons for discounting Plaintiff's credibility.

In evaluating a claimant's credibility, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.  An ALJ may also consider such factors as a claimant's inconsistent statements concerning symptoms and other statements that appear less than candid, the claimant's reputation for lying, unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, medical evidence tending to discount the severity of the claimant's subjective claims, and vague testimony as to the alleged disability and symptoms.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Smolen*, 80 F.3d 1273, 1284 (9th Cir. 1996).  If substantial evidence supports the ALJ's credibility determination, that determination must be upheld, even if some of the reasons cited by the ALJ are not correct.  *Carmickle*, 533 F.3d at 1162.

### B.    Plaintiff's Subjective Complaints

Because there was no evidence of malingering, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's subjective complaints were not wholly credible.  Plaintiff argues that the ALJ failed to do so. (Doc. 23 at 10-18.)  As discussed below, the ALJ listed several factors in support of his credibility assessment including that: Plaintiffs "daily activities [were] not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"; there were "significant gaps" in Plaintiff's treatment history; treatment had been "generally successful" in controlling her symptoms, and there were significant periods of time when Plaintiff was not taking medication for her symptoms; Plaintiff did not report urinary incontinence symptoms until January 2009; and she had "not generally received the type of medical treatment one would expect for a totally disabled individual."  (Tr. 21-22.)

### 1.      Circular Reasoning

As an initial matter in his assessment of Plaintiff's credibility, the ALJ stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. 21.)  Plaintiff argues that the ALJ's statement that Plaintiff's testimony was not credible to the extent that it was inconsistent with the ALJ's RFC assessment is improper circular reasoning because the ALJ was supposed to take into account the limiting effects of Plaintiff's symptoms in formulating his RFC, not determine Plaintiff's RFC and then reject any symptom testimony that was not consistent with that RFC.  *See Leitheiser v. Astrue*, 2012 WL 967647 at *9 (D. Or. Mar. 16, 2012) ("Dismissing a claimant's credibility because it is inconsistent with a conclusion that must itself address the claimant's credibility is circular reasoning and is not sustained by this court"); *Hale v. Astrue*, 2011 WL 6965856, at *4 (D. Or. Nov. 30, 2011) ("Dismissing a claimant's credibility because it is inconsistent with a conclusion that must itself address the claimant's credibility is improper circular reasoning").

Although the ALJ's statement could be considered improper circular reasoning if that statement were considered in isolation, the record reflects that the ALJ also identified the portions of Plaintiff's testimony that he deemed not credible.  (Tr. 21-22.)  The ALJ's challenged statement appears to be a summary, rather than an unsupported conclusion.  Moreover, even if the ALJ erred in relying on circular reasoning to discredit Plaintiff's credibility, any error was harmless because, as discussed below, he provided other clear and convincing reasons for discrediting Plaintiff's subjective complaints.

### 2.      Plaintiff's Activities

In discounting Plaintiff's credibility, the ALJ found that the activities she reported on a Function Report, including caring for her grandchildren, working on the computer, paying bills, making dinner, caring for her personal needs, and performing light

1    household chores, were inconsistent with her alleged disabling gastrointestinal

2    symptoms.[5]  (Tr. 21 (citing Admin. Hrg. Ex. 4E), Tr. 147-155.)[6]

3         An ALJ may rely on activities that "contradict claims of a totally debilitating

4    impairment" to find a claimant less than credible.  *Molina v. Astrue*, 674 F.3d 1104, 1113

5    (9th Cir. 2012).  Some of Plaintiff's limited activities of daily living — including

6    working on the computer, paying bills, making dinner, caring for her personal needs, and

7    performing light household chores — do not constitute clear and convincing evidence to

8    discount her credibility.  *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited

9    activities did not constitute convincing evidence that the claimant could function

10   regularly in a work setting).  However, caring for her grandchildren is an activity that

11   provides a clear and convincing reason for discrediting Plaintiff's credibility.

12        Plaintiff contends that the ALJ overstates her ability to care for her grandchildren

13   because she testified that the children spent the day at school or day care until her

14   husband was off work.  (Doc. 23 at 13 (citing Tr. 47).)  In the Function Report, which the

15   ALJ cited to discount Plaintiff's testimony, Plaintiff clarified that she considers her

16   husband a "roommate" and they "are separated in same house."  (Tr. 147.)  She also

17   stated that "on a good day" she can take the children to appointments, make dinner for

18   them, help with their homework, and put them to bed.  (Tr. 147-48.)  Later in that same

19   report she stated that she cared for two grandchildren "raising them as [her] own."

20   (Tr. 149.)  When asked whether anyone helped her care for "other people or animals,"

21   Plaintiff responded that her "husband cleans out the cat box," but she did not indicate that

22   he helped with the grandchildren.  (Tr. 149.)  She also indicated that she takes her

23   grandchildren to appointments "on a regular basis."  (Tr. 152.)

24        A claimant's activities, which are inconsistent with a claimed level of impairment,

25   are a proper basis upon which to base an adverse credibility determination.  *See* 20 C.F.R.

26

27        [5]  Contrary to Plaintiff's assertion (Doc. 23 at 13), the ALJ identified the activities
     that were inconsistent with Plaintiff's alleged gastrointestinal symptoms.

28        [6]  Administrative hearing Ex. 4E is located at Tr. 147-55.

§ 404.1529(c)(i); *Molina*, 674 F.3d at 1112-13.   The Ninth Circuit has found that the ability to care for a child is evidence of a claimant's ability to work.  *Molina*, 674 F.3d at 1113 ("the ALJ could reasonably conclude that Molina's activities, including walking her two grandchildren to and from school, attending church, shopping, and taking walks, undermined her claims that she was incapable of being around people without suffering debilitating panic attacks"); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (the ALJ properly found that the claimant's claim of totally disabling pain was undermined by her testimony about her activities, such as attending to the needs of her two young children).

In addition to Plaintiff's statements on the Function Report, Plaintiff's father indicated on a similar report that Plaintiff provided regular care for her grandchildren. (Tr. 147, 156-157 (noting that Plaintiff took her grandchildren to school and appointments, and had "normal parental responsibilities").)  The ALJ did err by relying on Plaintiff's ability to care for her grandchildren as a clear and convincing reason for finding her less than credible.  *See Tommasetti*, 533 F.3d at 1040; *Rollins*, 261 F.3d at 857.

### 3.    Gaps in Treatment

The ALJ also discounted Plaintiff's subjective complaints because of "significant gaps" in her treatment history including limited treatment before 2007, and from July 2009 until April 2010.  (Tr. 21 (citing Admin. Hrg. Exs 3F, 23F at 4, and 28F at 5.)[7]  A claimant's treatment, or lack of treatment, is a legitimate consideration in a credibility finding.  *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged); *see also Burch*, 400 F.3d at 681 (finding the ALJ's consideration of the claimant's failure to see treatment for a three or four month period was "powerful evidence" and an "ALJ is permitted to consider lack of treatment in his credibility determination).

---

[7] These administrative hearing exhibits appear at Tr. 217-37, 391, 439.

Plaintiff asserts that the ALJ failed to identify any specific gaps in treatment.  The ALJ, however, indicated that the "gaps" in treatment referred to Plaintiff's limited treatment before 2007, and from July 2009 and April 2010.  (Tr. 21.)  Thus, the ALJ did not err in failing to identify the periods during which Plaintiff had limited treatment.  In addition, although Plaintiff "acknowledges there has been limited treatment," she argues that it was improper for the ALJ to discount her symptom testimony based on a failure to obtain treatment because she was unable to afford it.  (Doc. 23 at 15, Doc. 30 at 6.)

A claimant's complaints may not be rejected due to a "lack of treatment when the record establishes that the claimant could not afford it."  *Regennitter v. Soc. Sec. Comm'r*, 166 F.3d 1294, 1297 (9th Cir. 1999) (citing *Smolen*, 80 F.3d at 1284); *Gamble v. Chater*, 68 F.3d 319, 322 (9th Cir. 1995) ("'It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'") (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984.  The certified administrative record, however, does not indicate that Plaintiff failed to seek treatment due to financial constraints.  While there is evidence that Plaintiff complained of financial stress to some treatment providers, she did not indicate that such stress impacted her ability to obtain care.  (Doc. 23 at 15 (citing Tr. 218 (noting difficulties financially but not equating that difficulty to failure to seek treatment), 272 (noting increased stress), 262 (duplicate of treatment note located at Tr. 218).)

In support of the assertion that she could not afford treatment, Plaintiff attached to her opening brief two letters from Dr. Mokhashi and Dr. Brown stating that she had difficulty paying for copays and other medical treatment.  (Doc. 23, Attachment A at 15-16.)  These letters were dated April 2011, which is after the ALJ's decision, but before the Appeals Council's decision.  "'[I]n cases involving submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing *and considered by the Appeals Council*."  *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000) (emphasis added); *see also Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) ("We properly may consider the additional materials because the

1    Appeals Council addressed them in the context of denying Appellant's request for

2    review.")

3           Plaintiff states that she provided the April 2011 letters to the Appeals Council, but

4    they were not included in the record.  (Doc. 30 at 7 n.5.)  Although it appears that

5    Plaintiff faxed these letters to the Appeals Council (Doc. 23, Attachment A at 5-6), there

6    is no indication that the Appeals Council considered the letters.  (*But see* Tr. 5 (noting

7    that the Appeals Council had received additional evidence identified as Medical Records

8    from Pulmonary Associates, October 13, 2009 – February 7, 2012 and had made it part of

9    the record).)  Accordingly, the Court considers the April 2011 letters new evidence.

10          In accordance with *Mayes v. Massanari*, 276 F.3d 453, 460-62 (9th Cir. 2001),

11   and sentence six of § 405(g), the Court may remand to the Commissioner for

12   consideration of additional evidence only if a plaintiff shows that (1) new evidence is

13   material to her disability; and (2) she has good cause for failing to submit the evidence

14   earlier.  *See Burton v. Heckler*, 724 F.2d 1415, 1417 (9th Cir. 1984) (applying same test

15   to records that had also been submitted to the Appeals Council, but which the Appeals

16   Council did not appear to consider).  To satisfy the materiality requirement, a plaintiff

17   must show "that the new evidence is material to and probative of his condition as it

18   existed at the relevant time — at or before the disability hearing."  *Sanchez v. Sec'y of*

19   *Health and Human Servs.*, 812 F.2d 509, 511 (9th Cir. 1987).  "[T]he new evidence

20   offered must bear directly and substantially on the matter in dispute."  *Burton v. Heckler*,

21   724 F.2d 1415, 1417 (9th Cir. 1984) (new evidence was material when the issue had been

22   expressly considered by the ALJ and was "squarely before the Appeals Council").

23          Here, while the April 2011 letters are new evidence, neither letter specified that

24   Plaintiff could not afford medical care before 2007, or from July 2009 through April

25   2010 ─ the periods during which the ALJ noted that Plaintiff had received limited

26   treatment.  (Doc. 23, Attachment A at 15-16.)  Additionally, those letters do not indicate

27   whether financial hardship impacted Plaintiff's ability to afford care from the disability

28   onset date in October 2004 through her date last insured, December 31, 2009, or through

the date of the disability hearing.  *See Sanchez*, 812 F.2d at 511.  Therefore, this new evidence does not create a "reasonable probability" of changing the outcome of the administrative decision and does not warrant remand or otherwise support Plaintiff's assertion that the ALJ erred in discounting her credibility based on her limited treatment before 2007, and from July 2009 through April 2010.

### 4.    Symptoms Controlled by Treatment

In further support of his determination that Plaintiff's symptom testimony was less than credible, the ALJ found that Plaintiff's "symptoms were generally controlled with Nexium."  (Tr. 21 (citing Admin. Hrg. Exs. 3F at 4, 18F at 2, and 23F at 9).)[8]  The treatment notes that the ALJ cites indicate that Nexium effectively controlled her GERD or acid reflux.  (Tr. 220, 366, 396.)

In assessing a claimant's credibility about her symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication."  20 C.F.R. § 404.1529(c).  Evidence that treatment can effectively control a claimant's symptoms may be a clear and convincing reason to find a claimant less credible.  *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *Warre v. Comm'r, of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (stating that "[i]mpairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits.").  Because the record reflects that Plaintiff's GERD or acid reflux was effectively controlled with treatment, the ALJ did not err in rejecting her acid reflux symptom testimony on that basis.

### 5.    Failure to Take Medication

The ALJ also rejected Plaintiff's allegations of disabling symptoms because there were "significant periods of time since the alleged onset date during which Plaintiff ha[d] not taken any medications for those symptoms."  (Tr. 22.)  The ALJ explained that, although Plaintiff reported cramping, abdominal pain, and diarrhea to Dr. Valeros in

---

[8]  These administrative hearing exhibits are located at Tr. 220, 366, 396.

January 2009, she indicated that she was not taking any medication to treat those symptoms.[9]  (Tr. 22 (citing Admin. Hrg. Ex. 8F at 1-2).)[10]

In assessing credibility, an ALJ may consider "[t]he type, dosage, effectiveness, and side effects of any medication."  20 C.F .R. § 404.1529(c)(3)(iv) (2012).  A claimant's failure to take medication is a legitimate basis for discounting a claimant's subjective complaints.  *See Morris v. Astrue*, 2012 WL 3548040, at *4 (C.D. Cal. Oct. 18, 2012) ("Plaintiff's allegation he suffers from disabling pain is undermined by his failure to consistently seek treatment, to use any medication, and by solely conservative treatment . . . .").

Here, Plaintiff does not dispute that there were significant periods of time during which she was not taking medication for her symptoms, including her cramping, abdominal pain, and diarrhea.  (Doc. 23 at 16, Doc. 30 at 7.)  However, Plaintiff provided a good reason for not taking medication to treat her IBS symptoms.  *See Smolen*, 80 F.3d at 1284 (citations omitted) (stating that an ALJ may not reject symptom testimony when the claimant provides a good reason for not taking medication).  During the administrative hearing, Plaintiff testified that when she was initially diagnosed with IBS, treatment providers prescribed "a bunch of medications to help with nausea, vomiting, and diarrhea."  (Tr. 36.)  She was also prescribed medications to treat the side effects of the other medications.  (*Id*.)  Because she discovered she was allergic to many of the medications, Plaintiff stopped taking everything except Nexium.  (*Id*.)  Dr. Morgan's September 2009 assessment noted that Plaintiff had severe side effects from most gastrointestinal related medications, including dizziness and headaches.  (Tr. 379.)

The Commissioner contends that Plaintiff's "allergic reactions" to medications are not documented in the medical record.  (Doc. 26 at 14 n.4.)  The medical record includes numerous notations of Plaintiff's allergies to medications including: "all families of

---

[9]  Plaintiff contends that the she had difficulty affording medication and cites to the letters submitted with her opening brief (Tr. 23 at 16), but these letters do not warrant remand.  (*See supra* Section V.B.3).

[10]  Administrative hearing Ex. 8F is located at Tr. 296-297

1   "abx"[11] (Tr. 389); codeine, penicillin, erythromycin, tetracycline, and sulfa.  (Tr. 346,

2   391, 392, 394).  Although the medical record does not describe the allergic reactions that

3   Plaintiff experienced when she took those medications, the record consistently identifies

4   several drugs to which Plaintiff was allergic.  Accordingly, the ALJ erred in rejecting

5   Plaintiff's subjective complaints based on her failure to take medication for her IBS

6   symptoms.

7   ## 6.   Reporting and Treatment of Urinary Incontinence

8   In rejecting Plaintiff's symptom testimony regarding her urinary incontinence, the

9   ALJ noted that Plaintiff did not report such symptoms until January 30, 2009.[12]  (Tr. 22

10  (citing Admin. Hrg. Ex. 13F at 5.)  The ALJ did not explain the significance of this

11  statement.  (Tr. 22.)  In her opposition brief, the Commissioner explains that symptoms

12  reported on January 30, 2009 would not support a disability determination because they

13  did not persist longer than twelve months before the expiration of Plaintiff's insured

14  status and, thus, did not meet the durational requirement for obtaining disability benefits.

15  (Doc. 26 at 13 (citing 20 CF.R. § 404.1509).)

16  Even assuming the Court could properly infer this rationale from the ALJ's

17  statement, it does not support the ALJ's rejection of Plaintiff's subjective complaints

18  regarding urinary incontinence.  Contrary to the Commissioner's assertion, to satisfy the

19  twelve-month durational period, symptoms must start before the date last insured and

20  continue for at least twelve months.  *See* 20 C.F.R.  § 404.1505(a) (providing that a

21  "disability [is] the inability to do any substantial gainful activity by reason of any

22  medically determinable physical or mental impairment which can be expected to result in

23  _____

24  [11]  The abbreviation "abx" refers to antibiotics.  Dan J. Tennenhouse *1 Attorney's*

25  *Medical Deskbook 5.3* (4th ed. 2013).

26  [12]  In her opposition brief, the Commissioner misconstrues the ALJ's decision as stating that Plaintiff did not report bowel incontinence until January 30, 2009, and did not report urinary incontinence until April 2010.  (Doc. 26 at 12-13.)  The ALJ only noted

27  that "[r]egarding the claimant's urinary incontinence" she did not report those symptoms until "January 2009."  (Tr. 22.)  Additionally, viewed in the light most favorable to

28  Plaintiff, the record reflects that she reported urinary incontinence before April 2010. (Tr. 355.)

death or which has lasted or can be expected to last for a continuous period of not less than 12 months."); *see also Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002) (to qualify for disability insurance benefits, a claimant must establish, among other things, that impairments lasted for continuous period of not less than twelve months and that the "period of disability began while [claimant] was insured for disability insurance benefits."). Here, Plaintiff's date last insured is December 31, 2009. (Tr. 14.) Plaintiff reported urinary incontinence problems in January 2009 and those problems continued for over twelve months. (Tr. 413-15, 455.) Thus, she satisfied the durational requirement.

The ALJ also rejected Plaintiff's subjective complaints regarding her urinary incontinence because she "had not generally received the type of treatment that one would expect for a totally disabled individual," and that the "record reflects limited treatment for this alleged impairment."[13] (Tr. 22 (citing Admin. Hrg. Exs. 23F at 4, 26F at 1-4, 29F at 1-3, located at Tr. 391, 413-16; Tr. 449-51).)

The treatment the claimant received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged); *see also Burch*, 400 F.3d at 681 (finding the ALJ's consideration of the claimant's failure to seek treatment for a three-or-four-month period was "powerful evidence" and an "ALJ is permitted to consider lack of treatment in his credibility determination). The Ninth Circuit has recognized evidence of "conservative treatment" as a reason to discount a plaintiff's testimony about the severity of an impairment. *See Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (holding that the claimant's ailments were not severe because they were treated only with over-the-counter

---

[13]   The ALJ did not specifically identify "this alleged impairment" for which Plaintiff received routine treatment. (Tr. 22.) However, the statement concerning routine treatment follows the ALJ's statement that Plaintiff did not report symptoms of urinary incontinence until January 2009 and refers to treatment notes focused on urinary incontinence. (*Id.*)

1   medication and explaining that "evidence of 'conservative treatment' is sufficient to

2   discount a claimant's testimony regarding severity of an impairment") (citing *Johnson v.*

3   *Shalala*, 60 F.3d 1428, 1434 (9th Cir.1995)).

4          Here, although it appears that Plaintiff first reported urinary incontinence on

5   January 30, 2009 (Tr. 355), the administrative record does not include other reports of

6   urinary incontinence until April 2010.  (Doc. 416.)  At that time, urologist Dr. Block

7   noted that Plaintiff was using "multiple pads per day (3)" for urgency and stress

8   incontinence.   (Tr. 41, 413-16, 449-51.)   In fall 2010, urologist Dr. Marshburn

9   recommended Kegel exercises, pelvic floor physiotherapy, and a subuerethral sling.

10  (Tr. 449.)  Although Plaintiff was interested in the suburethral sling procedure, it was

11  postponed due to a Plaintiff's involvement in a car accident.  (*Id.*, Doc. 30 at 9.)  The ALJ

12  considered these treatments "limited."  (Tr. 21, 22.)

13         The ALJ did not explain what he would consider appropriate treatment for

14  Plaintiff's urinary incontinence, and the record does not indicate what additional or other

15  treatments might be effective.  Plaintiff saw specialists for her urinary incontinence who

16  attempted to treat her symptoms.   The ALJ erred in rejecting Plaintiff's subjective

17  complaints regarding urinary incontinence based on his characterization of her treatment

18  modalities as "limited."   However, as previously discussed, he properly rejected

19  Plaintiff's complaints of disabling symptoms, including urinary incontinence, based on

20  the limited treatment Plaintiff received from July 2009 through April 2010.  (*See supra*

21  Section V.B.3; Tr. 21.)

22         **7.    Substantial Evidence Supports the ALJ's Credibility**
               **Determination**

23

24         Although the Court does not accept all of the ALJ's reasons in support of his

25  adverse credibility determination, the ALJ provided sufficient legally sufficient reasons

26  that are supported by substantial evidence in support of his credibility determination and,

27  therefore, the Court affirms that determination.  *See Batson*, 359 F.3d at 1197 (stating that

28  the court may affirm an ALJ's overall credibility conclusion even when not all of the

1    ALJ's reasons are upheld); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001)

2    (stating that "[e]ven if we discount some of the ALJ's observations of [the claimant's]

3    inconsistent statements and behavior . . . we are still left with substantial evidence to

4    support the ALJ's credibility determination.").

5             **C.       The ALJ's Assessment of Medical Opinion Evidence**

6                  **1.       Weight Assigned to Medical Source Opinions**

7             Plaintiff further argues that the ALJ did not provide legally sufficient reasons for

8    rejecting medical source opinion evidence.   In weighing medical source evidence, the

9    Ninth Circuit distinguishes between three types of physicians: (1) treating physicians,

10   who treat the claimant; (2) examining physicians, who examine but do not treat the

11   claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.

12   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   Generally, more weight is given to a

13   treating physician's opinion.   *Id*.   The ALJ must provide clear and convincing reasons

14   supported by substantial evidence for rejecting a treating or an examining physician's

15   uncontradicted opinion.   *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).   An

16   ALJ may reject the controverted opinion of a treating or an examining physician by

17   providing specific and legitimate reasons that are supported by substantial evidence in the

18   record.   *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at

19   725.

20            Opinions from non-examining medical sources are entitled to less weight than

21   treating or examining physicians.   *Lester*, 81 F.3d at 831.   Although an ALJ generally

22   gives more weight to an examining physician's opinion than to a non-examining

23   physician's opinion, a non-examining physician's opinion may nonetheless constitute

24   substantial evidence if it is consistent with other independent evidence in the record.

25   *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).   When evaluating medical

26   opinion evidence, the ALJ may consider "the amount of relevant evidence that supports

27   the opinion and the quality of the explanation provided; the consistency of the medical

28

opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

### 2.   Jeffrey Morgan, D.O.

Dr. Morgan, Plaintiff's treating physician, opined that during an eight-hour day, Plaintiff could sit, stand, and walk less than two hours each, and lift and carry less than ten pounds.  (Tr. 378-79, 381-82.)  He concluded that Plaintiff could not sustain an eight-hour work day, five days a week, on a sustained basis due to her IBS symptoms and frequent bowel movements ("up to 20") with fatigue.[14]  (Tr. 378)  After discussing the medical evidence in Plaintiff's case, the ALJ rejected this opinion because the treating record did not confirm the frequency of the symptoms.  (Tr. 22.)  The ALJ further stated that the limitations indicated were inconsistent with Plaintiff's reports of her activities.[15]  (*Id.*)

A treating physician's opinion is given controlling weight when it is "well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2).  On the other hand, if a treating physician's opinion "is not well-supported" or "is inconsistent with other substantial evidence in the record," then it should not be given controlling weight.  *Orn v. Astrue*, 495 F .3d 625, 631 (9th Cir. 2007).

Although treatment notes in the administrative record often include IBS among Plaintiff's diagnoses, those records include only limited notations regarding the

---

[14]   Dr. Morgan's written notes are difficult to read, but appear to indicate the Plaintiff had "frequent / up to 20" bowel movements.  (Tr. 378.)

[15]   The Commissioner argues that the ALJ did not err in rejecting Dr. Morgan's opinion because he only met with Plaintiff twice to complete RFC assessment forms.  (Doc. 26 at 19.)  The Commissioner further notes that Plaintiff was often treated by a physician assistant at Dr. Morgan's office.  (*Id.* at 3.)  The ALJ did not include this rationale in his opinion.  This Court's review is limited to "reasons and factual findings offered by the ALJ ─ not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."  *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009).  Accordingly, the Court limits its analysis to the rationale upon which the ALJ relied in determining that Plaintiff was not disabled.  *See Connett*, 340 F.3d at 874.

frequency of Plaintiff's IBS symptoms, particularly the frequency or urgency of her need to use the restroom due to diarrhea or vomiting.  An October 17, 2008 treatment note indicates that "postprandially [after meals] she tends to have diarrhea [and] cramping in the abdomen." (Tr. 128, 262 (duplicate).)  A January 30, 2009 treatment note indicates that Plaintiff had experienced "2 episodes of diarrhea since her last visit [on Jan. 9, 2009].[16]" (Tr. 355.)   A January 8, 2009 note by examining physician Dr. Steingard indicates that Plaintiff reported difficulty with activities of daily living because "she has to go to the bathroom so much." (Tr. 344.)  A July 24, 2009 treatment note indicates that Plaintiff's "GI problems" had worsened over the last few days and noted that Plaintiff was keeping a log of symptoms for her "SS disability," and that Plaintiff had diarrhea "7-17 times/day." (Tr. 395.)  Other treatments notes indicate that Plaintiff has vomited twice (Tr. 244), and had vomited four to five times a day for the past six days (Tr. 392).

Other treatment notes refer to diarrhea or other IBS symptoms, but do not include any information about the urgency of frequency of those symptoms.  (Tr. 222 (nausea and diarrhea); Tr. 224 (IBS symptoms under control); Tr. 241 (medication helped nausea); Tr. 242 (complained of nausea and denied vomiting); Tr. 356, 397 (nausea not improved); Tr. 260 (denied vomiting); Tr. 261 (medication helped nausea and Plaintiff denied vomiting); Tr. 366 (reported nausea and diarrhea "due to her diarrhea predominant irritable bowel syndrome") Tr. 387 (bloating and abdominal pain); Tr. 391 (Plaintiff "is slightly worse in terms of all symptomology").)

In summary, the administrative record includes few medical records in which Plaintiff reported the frequency of her IBS symptoms — specifically the frequency and urgency of her need to use the restroom.  Additionally, there are many treatment notes in which Plaintiff did not report the frequency or urgency of her IBS symptoms.  Because the ALJ is responsible for resolving conflicts in the medical record, the ALJ did not err in rejecting Dr. Morgan's opinion based on his determination that is was not supported by

---

[16] *See* Tr. 356.

1    the medical record.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164

2    (9th Cir. 2008) ("The ALJ is responsible for resolving conflicts in the medical record.").

3         Additionally, for the reasons discussed in Section V.B.2, the ALJ did not err in

4    rejecting Dr. Morgan's assessment as inconsistent with Plaintiff's activities, specifically

5    caring for her grandchildren.

6                          **3.       Dr. Steingard, D.O.**

7         In January 2009, Dr. Steingard completed a psychological/psychiatric medical

8    source statement. (Tr. 349.)  She opined that Plaintiff could "perform a variety of simple

9    tasks and also tasks requiring more than one or two steps." (*Id.*)  She further found that

10   Plaintiff "would have some difficulty in multitasking and that she would have particular

11   difficulty in a work environment if she perceived it as stressful."[17]  (Tr. 349.)  Plaintiff

12   does not specifically argue that the ALJ erred in his assessment of Dr. Steingard's

13   opinion.  Instead, she asserts that the ALJ "appears to accept" Dr. Steingard's opinion,

14   which Plaintiff argues supports a finding of disability. (Doc. 23 at 22.)

15        Plaintiff asserts that the vocational expert testified that a person with the

16   limitations that Dr. Steingard assessed would not be able to perform Plaintiff's past work

17   "and would not be able to perform other stressful work." (Doc. 30 at 14.)  As Plaintiff

18   notes, the vocational expert testified that an individual limited to simple work who

19   "would have difficulty if she perceived work to be stressful," would be unable to perform

20   Plaintiff's past relevant work, which the vocational expert agreed was "entry level

21   unskilled work that's not stressful." (Tr. 51.)  Consistent with this testimony, the ALJ

22   found that Plaintiff could not perform her past work. (Tr. 23.)

23        Although the vocational expert testified that a person with the limitations assessed

24   by Dr. Steingard could not perform Plaintiff's past relevant work, she did not testify that

25   _____

26        [17]  Although Dr. Steingard's report of her psychiatric evaluation of Plaintiff notes
     that Plaintiff reported that she "alternate[d] between doing chores and running to the
27   bathroom," (Tr. 347), Dr. Steingard did not make any findings regarding the frequency of
     Plaintiff's trips to the bathroom or include "frequent trips to the restroom" as a limitation
28   on the psychological/psychiatric medical source statement, as Plaintiff suggests.
     (Tr. 349; Doc. 30 at 14.)

1   those limitations would preclude all work.  (Tr. 52-53.)  Thus, the Court disagrees with

2   Plaintiff's characterization of the vocational expert's testimony as stating that a person

3   with the limitations assessed by Dr. Steingard would be precluded from "sustaining full

4   time competitive work."  (Doc. 30 at 14.)

5                    **4.       Quirino Valeros, M.D.**

6        Examining physician Dr. Valeros opined that Plaintiff could occasionally lift thirty

7   to forty pounds, frequently lift ten pounds, could stand/walk five hours in an eight hour

8   day, and was not limited in her ability to sit.  (Tr. 363-64.)  He further found Plaintiff

9   could frequently climb ramps/stairs, kneel, crouch, reach, handle, finger, and feel.

10  (Tr. 363.)  The ALJ gave "significant weight" to Dr. Valero's opinion because it was

11  consistent with the treating record.  However, the ALJ found Plaintiff was more limited

12  than Dr. Valeros had assessed because the record supported a finding that Plaintiff was

13  limited to sedentary work "when the medical evidence was read in the light most

14  favorable to the claimant."  (Tr. 22.)

15       Plaintiff argues that the ALJ erred in assigning weight to this opinion because

16  Dr. Valeros did not discuss the frequency and severity of Plaintiff's diarrhea and her need

17  to use the bathroom, he did not review "substantial records," and because the ALJ did not

18  explain how he assigned the opinion "significant weight," but also found Plaintiff more

19  limited than Dr. Valeros's assessment.  (Doc. 23 at 23.)

20       As previously discussed, the record includes limited treatment notes regarding the

21  frequency or severity of Plaintiff's diarrhea and her need to use the restroom, thus the

22  ALJ did not err in relying on an examining doctor's opinion that did not specifically

23  address that issue.   Additionally, Plaintiff does not explain what she means by

24  "substantial records."  Although the ALJ found Plaintiff more limited than an examining

25  doctor's assessment of her limitations, Plaintiff has not cited any authority indicating that

26  an ALJ cannot moderate "the full adverse force of a medical opinion" in a manner that is

27  more favorable to a claimant.  *See Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012)

28

1   (stating that an ALJ does not commit reversible error by tempering extremes of medical

2   opinion that are adverse to claimant's application for disability benefits).

3       **D.**    **Weight Assigned to Other Source Opinions**

4           **1.**    **Josh Baldwin, D.C.**

5         In February 2011, Dr. Baldwin, Plaintiff's treating chiropractor, opined that

6   Plaintiff was limited in her ability to perform work-related activities due to her

7   headaches, irritable bowel with diarrhea, nausea, vomiting, dizziness, and blurred vision.

8   (Tr. 533.)  He stated that Plaintiff had IBS with diarrhea five-to-six times per week, and

9   she experienced nausea daily.  (*Id.*)  Dr. Baldwin indicated that Plaintiff's symptoms

10  lasted an average of three or more hours.  (Tr. 533.)  After discussing the medical record,

11  the ALJ rejected Dr. Baldwin's opinion about the duration of Plaintiff's symptoms

12  because it was not confirmed by the treating record or consistent with the course of

13  treatment pursued.  (Tr. 22.)  Plaintiff alleges that the ALJ erred by rejecting

14  Dr. Baldwin's opinion on grounds that he was not an acceptable medical source and that

15  his opinion was not supported by the record.  (Doc. 23 at 21.)

16        Chiropractors are not considered "acceptable medical sources" under the Social

17  Security regulations.  20 C.F.R. § 404.1513(d)(1), 416.913(d)(1).  Rather, these medical

18  professionals are considered "other medical sources."  *Id.*  However, in determining

19  whether a claimant is disabled, an ALJ must consider lay witness testimony, including

20  "other medical source" opinions, concerning a claimant's ability to work.[18]  *See Nguyen*

21  *v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted) (stating that "[l]ay

22  testimony as to a claimant's symptoms or how an impairment affects ability to work is

23  competent evidence . . . and therefore cannot be disregarded without comment"); *Dodrill*

24  _____

25      [18]  The distinction between "other sources" and "acceptable medical sources" is significant because only an "acceptable medical source" may be considered a "treating

26  source."  20 C.F.R. §§ 404.1502, 416.902, 4040.1513(a).  However, when there is an agency relationship between an "acceptable medical source" and an "other source,"

27  evidence from that "other source" may be ascribed to the supervising "acceptable medical source."  *Buck v. Astrue*, 2010 WL 2650038, * 5 (D. Ariz. July 1, 2010) (discussing *Gomez v. Chater*, 74 F.3d 967, 970–71 (9th Cir. 1996) (affording great weight to a nurse

28  practitioner's opinion because she worked closely on an interdisciplinary team with a doctor)).

*v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) (ALJ must give reasons that are germane to each witness for rejecting lay witness testimony); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e); SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (opinions from other medical sources who are not acceptable medical sources "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."). The ALJ may discount testimony from these "other sources" if the ALJ "'gives reasons germane to each witness for doing so.'" *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."))

The record reflects that the ALJ did not reject Dr. Baldwin's opinion because he was not an acceptable medical source. Rather, the ALJ explained that he weighed Dr. Baldwin's opinion as an other medical source in accordance with SSR 06-03p. (Tr. 22.) Because a chiropractor is considered an other source, the ALJ appropriately considered Dr. Baldwin's opinion. The ALJ's conclusion that the record did not support Dr. Baldwin's opinion is a "germane" reason for rejecting his opinion because a medical opinion may be discounted when it is conclusory and not supported by objective medical evidence. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (An ALJ may discount testimony from "other sources" if the ALJ "gives reasons germane to each witness for doing so"); *Johnson v. Shalala*, 6 F.3d 1428, 1432-33 (9th Cir. 1995).

Additionally, the record supports the ALJ's conclusion. The record reflects that with the exception of two treatment notes (Tr. 472 (noting bloody stool and passing kidney stone) and Tr. 473 (noting urinary incontinence)), Dr. Baldwin's treatment notes did not include notations regarding the severity of Plaintiff's "irritable bowel with diarrhea, nausea, [and] vomiting," or headaches — symptoms he later described Plaintiff as experiencing for three hours at a time on a regular basis in his 2011 assessment. (Tr. 533.) Additionally, Dr. Baldwin's treatment notes indicate that Plaintiff first

1    reported headaches in February 2010.  (Tr. 471 ("new complaint" of moderately severe

2    dizziness).)  From February 2010 until early June 2010, Plaintiff reported improvement in

3    her dizziness.  (Tr. 472-91.)   Although Plaintiff experienced increased dizziness from

4    mid-June to August 2010 (Tr. 492-96), she subsequently reported that her dizziness had

5    improved.  (Tr. 497-506.)   Accordingly, the ALJ did not err in rejecting Dr. Baldwin's

6    opinion.

7                       **2.    John W. Palmer**

8         Plaintiff's father John W. Palmer completed a Function Report on November 11,

9    2008.  (Tr. 156.)  He reported that he talked with Plaintiff daily and visited her at her

10   home twice a month.  (*Id.*)  He stated that Plaintiff "needs to be near a restroom," and

11   sometimes "cannot get out of the house" because stress aggravates her IBS, asthma,

12   fibromyalgia, intellectual problems, and heart problems.  (*Id.*)   He also reported that

13   Plaintiff had "custodial care for her grandchildren, and that she took then to school and

14   appointments, and engaged in other "normal parenting responsibilities."  (Tr. 157.)

15        The ALJ gave "little weight" to Mr. Palmer's assessment of Plaintiff's limitations

16   because he only saw her twice a month.  (Tr. 22.)  He also noted that Mr. Palmer's

17   assessment of Plaintiff's limited ability to lift, squat, bend, walk, sit, kneel, and complete

18   personal tasks was inconsistent with his report that Plaintiff cared for her grandchildren,

19   including taking them to school and all their appointments.  (*Id.*)  Plaintiff contends that

20   the ALJ erred in assigning little weight to Mr. Palmer's opinion.  (Doc. 23 at 25.)

21        In determining whether a claimant is disabled, an ALJ must consider lay witness

22   testimony concerning a claimant's ability to work.  *See Nguyen*, 100 F.3d at 1467.  The

23   ALJ may discount lay witness testimony if he "gives reasons germane to each witness for

24   doing so."   *See Turner,* 613 F.3d at 1224.   Here the ALJ did not err in assigning

25   Mr. Palmer's opinion little weight.  Mr. Palmer's limited observation of Plaintiff is a

26   legally sufficient reason for discounting his opinion.  *See Dodrill v. Shalala*, 12 F.3d 915,

27   919 (9th Cir. 1993) (stating that testimony of lay witnesses who see the claimant every

28   day is of particular value and finding that ALJ properly rejected testimony of lay witness

1    who did not "explain sufficiently when and to what extent they had the opportunity to

2    observe their mother.").

3            Additionally, conflicts between the functional limitations that Mr. Palmer assessed

4    and his report that Plaintiff cared for her grandchildren are a germane reason for

5    discounting his opinion.    Inconsistencies in a lay witness's statements regarding the

6    claimant's level of functioning are a germane reason for giving the lay witness testimony

7    limited weight.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Ditto v.*

8    *Comm'r of Soc. Sec. Admin.*, 401 Fed. Appx. 192, 193–94 (9th Cir. 2010)

9    ("inconsistencies in [plaintiff's] husband's statements regarding his wife's level of

10   functioning" is germane reason).

11           **E.     Residual Functional Capacity Assessment**

12           The    ALJ    assessed    an    RFC    for    "sedentary    work    as    defined    in

13   20 C.F.R. § 404.1567(a) except the claimant is limited to unskilled work due to the

14   effects of intermittent abdominal pain."  (Tr. 19.)  Plaintiff contends the ALJ's RFC

15   assessment is legally insufficient because he did not complete a function-by-function

16   assessment.  (Doc. 23 at 8.)  Plaintiff contends that the ALJ erred by failing to discuss

17   whether Plaintiff needed a sit/stand option, her frequent bathroom breaks and absences

18   from work, and her difficulties dealing with stress and multitasking.  (*Id.* at 8, 15)[19]

19           In determining Plaintiff's RFC, the ALJ expressly found that Plaintiff would be

20   limited to "sedentary" "unskilled" work."  (Tr. 19.)  Pursuant to 20 C.F.R. § 404.1567(a),

21   sedentary work "involves lifting no more than 10 pounds at a time and occasionally

22   lifting or carrying articles like docket files, ledgers, and small tools."   20 C.F.R.

23   404.1567(a).   The basic mental demands of unskilled work include the abilities to

24   understand, remember, and carry out simple instructions, to make simple work-related

25   _____

26           [19]   In the section of her opening brief discussing medical opinion evidence,
     Plaintiff argues that the ALJ erred by not including the opinion of Dr. Horsley, confirmed
27   by Dr. Quinones, that "proximity to a toilet was a necessity" in his RFC assessment.
     (Doc. 23 at 24.)  Because this argument pertains to the ALJ's RFC assessment, the Court
28   discusses it in Section V.E rather than in the discussion of medical opinions in Section
     V.C.

1  decisions, to respond appropriately to supervision, co-workers, and usual work situations,

2  and to deal with changes in a routine work setting.  SSR 96–9p, 1996 WL 374185 at *9

3  (July 2, 1996).

4  The ALJ cited SSR 96–8p, 1996 WL 374184 (July 2, 1996), as part of the process

5  he would use in determining Plaintiff's residual functional capacity and in arriving at his

6  conclusion.  (Tr. 18.)   Social Security Ruling 96–8p states the policies regarding the

7  assessment of a claimant's RFC.[20]   However, "[t]he ALJ is not required, as [claimant]

8  contends, to engage in a function-by-function analysis under SSR 96–8p.  This regulation

9  requires only that the ALJ discuss how evidence supports the residual function capacity

10  assessment and explain how the ALJ resolved material inconsistencies or ambiguities in

11  evidence . . . ."[21]   Mason v. Comm'r of Soc. Sec., 379 F. App'x 638, 639 (9th Cir. 2010);

12  see also Weiner v. Colvin, 2013 WL 3440021, at *6 (D. Ariz. Jul. 9, 2013) (relying on

13  Mason in support of conclusion that ALJ did not err in assessing an RFC for "unskilled"

14  work); Sheridan v. Colvin, 2013 WL 1191202, at *6 (D. Ariz. Mar. 22, 2013) (relying on

15  Mason to support conclusion that ALJ was not required to engage in a function-by-

16  function assessment).   Additionally, "[p]reparing a function-by-function analysis for

17  medical conditions or impairments that the ALJ found neither credible nor supported by

18  the record is unnecessary."  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).

19

20  [20]  Social Security Ruling 96–8p explains:

21  At step 5 of the sequential evaluation process, [residual
    functional capacity] must be expressed in terms of, or related

22  to, the exertional categories when the adjudicator determines
    whether there is other work the individual can do.  However,

23  in order for an individual to do a full range of work at a given
    level, such as sedentary, the individual must be able to

24  perform substantially all of the exertional and non-exertional
    functions required in work at that level.   Therefore, it is

25  necessary to assess the individual's capacity to perform each
    of these functions in order to decide which exertional level is

26  appropriate and whether the individual is capable of doing the
    full range of work contemplated by the exertional level.

27  [21]  Similar to Mason, in this case the ALJ discussed the relevant medical evidence
    and testimony related to Plaintiff's claimed impairments and limitations and considered

28  the RFC assessments of Dr. Valeros and the state agency reviewing physicians to reach
    his conclusions regarding Plaintiff's RFC.

1    Accordingly, Plaintiff's argument is unfounded.  The ALJ made his decision based

2    on the record as a whole and cited the parts of the record supporting his decision

3    throughout his analysis.  (Tr. 14-24.)   The Court concludes that the ALJ's RFC

4    assessment meets the burden imposed by SSR 96–8p and is supported by substantial

5    evidence.[22]

6    **F.    Application of the Grids**

7    Finally, Plaintiff argues that that the ALJ erred at step five of the sequential

8    evaluation by relying on the Medical-Vocational Guidelines (the Grids) to determine

9    whether she was disabled under the Act because the Grids do not account for Plaintiff's

10   non-exertional limitations resulting from her IBS, GERD, urge and stress incontinence,

11   obesity, and asthma.  (Doc. 23 at 25.)   The Commissioner responds that the use of the

12   Grids was appropriate.  (Doc. 26 at 22.)

13   At step five, the ALJ considers whether claimant can perform work that exists in

14   the national economy considering the claimant's RFC, age, education, and work

15   experience.   The Commissioner can make a step-five determination by either using "the

16   testimony of a vocational expert or by reference to the Medical Vocational Guidelines."

17   *Thomas*, 278 F.3d at 955.   The Grids "consist of a matrix of [the four factors including

18   claimant's RFC, age, work experience, and education] and set forth rules that identify

19   whether jobs requiring a specific combination of these factors exist in significant

20   numbers in the national economy."  *Heckler v. Campbell*, 461 U.S. 458, 461–62 (1983).

21   "The [Social Security Administration's] need for efficiency justifies use of the grids at

22   step five where they completely and accurately represent a claimant's limitations."

23   *Tackett*, 180 F.3d at 1101 (internal citation omitted).  "An ALJ can use the Grids without

24   _____

25   [22]   Additionally, even if the ALJ erred by failing to assess Plaintiff's abilities on
     each of the seven strength demands, Plaintiff has not shown reversible error.  The ALJ
26   assigned great weight to Dr. Valeros's opinion, which included the required evaluation of
     Plaintiff's strength abilities.  Dr. Valeros concluded that Plaintiff could frequently lift ten
27   pounds, occasionally lift thirty to forty pounds, stand and walk for five hours in a day.
     (Tr. 20, 22.)  Dr. Valeros also noted that Plaintiff should avoid ladders, ropes, scaffolds,
28   heights, moving machinery, chemicals, gases and dusts and fumes.  (Tr. 20.)  After
     considering the entire record, the ALJ found Plaintiff more limited than Dr. Valeros's
     assessment.

vocational expert testimony when a non-exertional limitation is alleged because the Grids provide for the evaluation of claimants asserting both exertional and non-exertional limitations."[23]  *Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007). The Grids are inapplicable, however, "when a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations." *Id*.

Here, the ALJ heard testimony from a vocational expert at the administrative hearing and then relied on the Grids to make his disability determination at step five of his written decision.  (Tr.  23-24.)  Plaintiff argues that the ALJ erred in relying on the Grids because she had several non-exertional limitations including (1) frequent bathroom use and the need to be near a bathroom, and (2) avoidance of stress and multitasking. (Doc. 30 at 27.)   However, the determinative issue is not simply whether plaintiff had non-exertional limitations, but whether they were "sufficiently severe." *Id.*  (stating that when a claimant has "significant non-exertional limitations," the ALJ cannot rely solely on the grids); *see also Burkhart*, 856 F.2d at 1340 ("the grids are inapplicable [w]hen a claimant's non-exertional limitations are sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitations.") (internal quotations omitted).  Non-exertional limitations that may make reliance on the Grids inappropriate include: poor vision, *see Tackett*, 180 F.3d at 1101-02; pain, *see Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985); and "'mental, sensory, postural, manipulative, or environmental (e.g., inability to tolerate dust or fumes) limitations.'"  *Burkhart*, 856 F.2d at 1340-41 (quoting *Desrosiers v. Sec'y of Health and Human Servs*, 846 F.2d 573, 579 (9th Cir. 1988)).

---

[23]  "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs."  20 C.F .R. §§ 404.1569a(b), 416.969a(b).   "Non-exertional limitations" only affect the claimant's "ability to meet the demands of jobs other than strength demands."  20 C.F.R. § § 404.1569a(c)(1), 416. 969a(c)(1).

1    Here, the ALJ concluded that Plaintiff had the RFC to perform sedentary work,

2  restricted to unskilled work.  Unskilled work is "work that needs little or no judgment to

3  do simple duties that can be learned on the job in a short period of time."   20

4  C.F.R. § 416.968(a).   Here, Plaintiff's non-exertional limitations were not sufficiently

5  severe to preclude use of the Grids.   First, because the Court affirms the ALJ's

6  determination that Plaintiff's subjective complaints regarding the frequency and severity

7  of her IBS and related symptoms were not entirely credible, that limitation is not

8  sufficiently severe.  *See Hoopai*, 499 F.3d at 1075.   Second, as the ALJ found, the

9  additional limitations do not significantly erode the occupational base for a range of

10  unskilled sedentary work.[24]  (Tr. 24); *see* 1996 WL 3741835, at *7-8.  The Grids state

11  that someone who can perform unskilled, sedentary work retains work capacity and there

12  are "approximately 200 separate unskilled sedentary occupations that can be identified,

13  each representing numerous jobs in the national economy."  *See* 20 C.F.R., Part 404,

14  Subpart P, Appendix 2 § 201.00.   Because Plaintiff's non-exertional limitations were

15  adequately accounted for in the Grids, the ALJ did not err in consulting the Grids in

16  making his disability determination.

17  **VII.    Conclusion**

18    As set forth above, the ALJ provided legally sufficient reasons for discounting

19  Plaintiff's credibility, appropriately weighed the medical opinion evidence and other

20  source and lay opinions, properly assessed Plaintiff's RFC, and properly applied the

21  Grids to determine whether Plaintiff was disabled.  Therefore, the Court concludes that

22  ALJ's opinion is supported by substantial evidence in the record and any legal errors are

23  harmless.

24    Accordingly,

25

26

27

28    [24]    Additionally, the vocational expert testified that an individual who had difficulty with multitasking and stress was precluded from performing Plaintiff's past relevant work, but was not precluded from all work.  (Tr. 51-53.)

**IT IS ORDERED** that the Commissioner's disability determination in this case is **AFFIRMED**.   The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff and to terminate this action.

Dated this 17th day of March, 2014.


Bridget S. Bade
United States Magistrate Judge